## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE INNOCENCE PROJECT, INC., <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL MUSEUM OF HEALTH AND MEDICINE; DEFENSE HEALTH AGENCY; DEPARTMENT OF DEFENSE; LAURA CUTTER, Archivist of the National Museum of Health and Medicine; DAVID SHACKELFORD, Curator of the National Museum of Health and Medicine; ADRIANNE NOE, Director of the National Museum of Health and Medicine; RAQUEL BONO, Director of the Defense Health Agency; and PATRICK SHANAHAN, Acting Secretary of Defense, all in their official capacities, <br><br> Defendants. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      The federal government's National Museum of Health and Medicine ("the Museum") has refused to allow the Innocence Project, Inc. to visit its archives of the American Board of Forensic Odontology ("ABFO"). In doing so, the Museum has prevented legitimate inquiry into the history of bite mark analysis, a tragically flawed forensic science. It has also blocked access to records that could help exonerate dozens of people who may have been wrongfully convicted on the basis of bite mark evidence. The Museum denied access because the Innocence Project has been an outspoken critic of forensic odontology and plans to conduct research that could further expose both its scientific defects and human toll, casting the ABFO in

a bad light. This violates the First Amendment: the government may not block access to a public archive because it disfavors a researcher's viewpoint or because a researcher plans to publish facts and develop arguments that are uncomfortable or embarrassing.

2.      The Museum, which is part of the Department of Defense ("DoD"), holds the historical papers of the ABFO, which is the primary organization that has fostered forensic bite mark analysis and which certifies dentists to serve as forensic bite mark experts. For decades ABFO-certified experts, following ABFO guidelines, testified that they could definitively identify a perpetrator by comparing his teeth with a purported bite mark found on a victim's body or elsewhere at the scene of a crime. ABFO members have provided testimony or provided police and prosecution evidence leading to the conviction of defendants, by trial or by plea, in a plethora of criminal cases.

3.      This type of bite mark analysis has now been thoroughly discredited by scientists and scholars—indeed, by every disinterested scientist and scholar to have studied it. A recent study showed that forensic odontologists could not even reliably determine which injuries were bite marks, let alone match a mark to a unique individual's teeth.

4.      Untold numbers of people have been falsely convicted as a result of this faulty science. To date, there are at least 30 known wrongful convictions and indictments attributable to the use of bite mark evidence. Many more presumably remain in prison. In the face of the mounting scientific evidence discrediting the technique and the ever-growing number of wrongful convictions exposed, the ABFO has been forced to retreat from its prior claims that its methods were extraordinarily precise. However, the ABFO still vigorously opposes efforts by the Innocence Project and others to challenge the reliability of bite mark evidence in court—or to

identify people wrongfully convicted as a result of the faulty testimony of ABFO members, even where the ABFO itself implicitly admits that the testimony was faulty.

5.     The DoD Museum that holds the ABFO's archives has the authority to grant public access to outside researchers, and does so by special appointment. The Innocence Project submitted a formal request to visit the archive and review the ABFO collection in order to shed light on how the ABFO developed bite mark analysis methods and how it trained forensic odontologists on those methods. The Museum's ABFO holdings also include the files of many individual forensic odontologists, detailing their work on specific criminal cases. Those documents are perhaps the best and only centralized catalog of cases in which bite mark testimony has been used. They are an invaluable resource for bite mark researchers. The Innocence Project sought to review those files in order both to understand the historical practice of bite mark analysis and to identify potential wrongful convictions.

6.     Initially, it appeared that Innocence Project researchers would be allowed to access the archives—the Museum's archivist stated as much in the course of correspondence following the Innocence Project's formal request. However, after the archivist conferred with the ABFO about the Innocence Project's interest, the Museum's posture changed radically.

7.     The Museum subsequently rejected the Innocence Project request to visit the archives. The Museum's formal letter denying access suggested that it did so because it disagreed with the Innocence Project's viewpoint, its likely findings, and its planned speech and advocacy—specifically, its goal of discovering and investigating individual cases that may have resulted in wrongful conviction and of publishing scholarship critical of bite mark analysis. The Museum evidently sided with the ABFO—which has been hostile to the work of the Innocence Project and other critics—to prevent the Innocence Project from conducting research that could

3

have produced unwelcome results and which could have further embarrassed the ABFO and its members.

8.     The Museum had no legitimate basis for denying the Innocence Project's request outright. In fact, the Museum has previously granted access to at least one other organization that sought records from the same archives for similar reasons. That organization, however, was not yet understood to be a critic of bite mark analysis or a foe of the ABFO. Specifically, the Museum worked cooperatively with the Texas Forensic Sciences Commission ("Commission") to mine the ABFO papers and compile information that the Commission requested. At the time, the Texas Commission—unlike the Innocence Project—had not denounced bite mark analysis. This difference in viewpoint seemed important to the Museum's decision to cooperate. Indeed, before the Museum granted access to the Texas Commission, the Museum's archivist spoke with an ABFO representative and then specifically asked the Commission whether it was working with the Innocence Project. This was apparently an effort to determine whether the Commission was aligned with a known critic of bite mark analysis and the ABFO.

9.     The Museum's decision to refuse to allow the Innocence Project to conduct research in the archives violates the First Amendment's bedrock prohibition on viewpoint discrimination. Because the government has opened the archive to the members of the public, the First Amendment prohibits the government from turning people away because it disagrees with their viewpoint or favors an opposing viewpoint.

10.     Defendants may not block the Innocence Project because its researchers have the "wrong" view of the subject matter, or because they will use information they gather to engage in speech or advocacy the government (or the ABFO) disfavors. Neither can the government

prevent the Innocence Project from viewing the archives in order to thwart speech and advocacy that would be critical of a private party that the government favors.

11.     After the Museum refused the request to visit the archives, the Innocence Project pursued an alternative method of accessing the ABFO records, filing a Freedom of Information Act ("FOIA") request for both the records in the archive and correspondence between the Museum and ABFO that might corroborate the Museum's motives for denying access. The Innocence Project would have preferred to physically visit the archives and conduct research with the assistance of Museum staff—just like any other researcher—but was forced to pursue disclosure through the more cumbersome FOIA process.

12.     This effort has also been stymied. FOIA requires agencies to respond within twenty business days, but the request was filed nearly one year ago and the Innocence Project has yet to receive almost any substantive response.

13.     The Innocence Project thus brings this action in order to vindicate its right to conduct archival research that would further expose a flawed forensic science and could even identify innocent people languishing in prison as a result of unreliable evidence. The Museum's decision to block the Innocence Project violated the First Amendment. Its decision was also arbitrary and capricious, in violation of the Administrative Procedure Act. Its refusal even to process and produce documents in response to a FOIA request is likewise unlawful. Through this lawsuit, the Innocence Project asks the Court to compel the Museum to allow access to conduct research in the archives—or at least to obtain copies, appropriately redacted, of the archives' contents.

## PARTIES

*Plaintiff*

14. The **Innocence Project, Inc.** is a non-profit organization focused on exonerating individuals who have been wrongfully convicted. It was founded in 1992 at Yeshiva University, Cardozo School of Law, by Peter Neufeld and Barry Scheck.

15. The Innocence Project conducts scientific and legal scholarly research to understand the causes of wrongful convictions. This research is meant to prevent future wrongful convictions, to support legislative, administrative, and judicial reform initiatives designed to enhance the truth-seeking functions of the criminal justice system, and to identify and exonerate innocent people currently imprisoned.

16. A major focus of this research program is investigating the reliability of forensic science methods, including bite mark analysis, that are used in criminal cases. Innocence Project employees regularly publish research and engage in advocacy to end the use of methods that produce false convictions. The Innocence Project also works to identify individuals who have been falsely convicted because of unreliable forensic evidence or testimony.

*Defendants*

17. The **National Museum of Health and Medicine** is a component of the Defense Health Agency, which is itself a component of the Department of Defense. The Museum is located on Army land in Silver Spring, Maryland. It was established in 1862 by U.S. Army Surgeon General William A. Hammond and is dedicated to "preserving, collecting, and interpreting the objects, specimens, photographs and documents chronicling the history and practice of medicine over the centuries." The Museum routinely displays exhibits about the history of American medicine. The Museum also has open educational programs, including one that simulates a forensics workshop. The Museum is open to the public, and its extensive

archives are available to researchers by appointment upon request, in accordance with a published Standard Operating Procedure ("SOP").

18.     The Museum's archives hold the historical papers of ABFO. The ABFO transferred its papers to the Museum, which subsequently organized, catalogued, and archived the collection. The Museum determines who may access the ABFO collection in accordance with the same SOP that governs all of its other collections. The Museum unlawfully denied the Innocence Project's request to visit the archives or to conduct research using that collection.

19.     The **Defense Health Agency** ("DHA") is a component of the Department of Defense. The Museum is a sub-component of DHA. DHA funds and maintains the Museum and exercises ultimate administrative control over the Museum, including its archives.

20.     DHA is responsible for processing the FOIA request that the Innocence Project submitted seeking access to records held by the Museum. DHA has failed to provide a timely or complete response to the Innocence Project's FOIA request.

21.     The **Department of Defense** ("DoD") is an agency of the federal government that oversees all military operations and personnel, including DHA and the Museum.

22.     DoD has overall responsibility for and authority over the conduct of DHA and the Museum, including both access by researchers to its archives and compliance with FOIA.

23.     **Laura Cutter** is Chief Archivist at the Museum. She is the individual who was primarily responsible for considering the Innocence Project's request to conduct research in the archive and with whom the Innocence Project corresponded.

24.     **David Shackelford** is Curator of Collections at the Museum. He has overall responsibility for overseeing the Museum's archives and was involved in the decision to deny the Innocence Project's request to conduct research in the archive.

25.     **Adrianne Noe** is Director of the Museum. She has overall authority to oversee Museum operations and staff, including decisions to grant researchers access to visit the Museum archive and to direct Museum staff to assist researchers seeking to conduct research in the archives.

26.     Vice Admiral **Raquel Bono** is Director of the Defense Health Agency. She has authority over all DHA operations, including those of the Museum.

27.     **Patrick Shanahan** is the Acting Secretary of Defense. He has authority over all DoD programs and operations, including those of DHA and the Museum.

28.     Defendants Cutter, Noe, Bono, and Shanahan, are sued in their official capacities.

29.     Defendants Museum, DHA, and DoD are agencies within the meaning of 5 U.S.C. §§ 552(f)(1) and 701(b)(1).

## JURISDICTION AND VENUE

30.     This action arises under, and alleges violations of, the First Amendment to the United States Constitution, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

31.     The Court has jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 702, 704, and 5 U.S.C. § 552.

32.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(c) and 5 U.S.C. § 552(a)(4)(B) because Plaintiff has its principal place of business in New York City; no real property is involved in this action; and the Defendants are federal agencies or officers of the United States sued in their official capacities.

## FACTS

### A.      Bite Mark Analysis is Unsound and Has Led to Wrongful Convictions

33.      The field of forensic odontology is concerned with the use of dental evidence in the criminal justice system.

34.      One branch of forensic odontology focuses on analyzing bite marks, or potential bite marks, which may be found on the soft tissue of a victim or a perpetrator, and occasionally in food or other objects left at the scene of a crime.

35.      Forensic odontologists examine certain pattern injuries and purport to be able to draw conclusions about the kind of injury (*i.e.*, whether it was caused by human teeth), and if so, about the person who caused the bite mark.

36.      Bite mark analysis was once believed to be a reliable forensic tool to convict criminal defendants. It was first used in American courts in 1954, and it began gaining widespread use in 1974.

37.      For decades, forensic odontologists and their accrediting body, the ABFO (founded in 1975), claimed that this method allowed them to conclusively determine the specific person corresponding to a bite mark. On this basis, they frequently offered expert testimony in criminal cases that a bite mark was made by the criminal defendant, to the exclusion of all other potential sources.

38.      Despite its long history, forensic bite mark analysis has proven to be unreliable. A 1975 study found that bite mark examiners made incorrect identifications of bites on pig skin 24% of the time even where the bites were made under ideal laboratory conditions, and 91% of the time when the bites were photographed 24 hours after being made.

39.      In 1999, the ABFO itself conducted a study on the reliability of bite marks and found a 63.5% rate of false identifications.

40.     A 2009 report in the National Academy of Sciences, entitled *Strengthening Forensic Science in the United States: A Path Forward,* concluded that supposed bite mark experts "have yet to establish either the validity of their approach or the accuracy of their conclusions []." The report drew several conclusions, including that: (1) Dentition—*i.e.* the shape and arrangement of a person's teeth—has never been scientifically demonstrated to be unique; (2) Even if dentition were unique, human skin is not capable of accurately recording those unique features; (3) Forensic dentists cannot reliably associate a dentition with a bite mark; and (4) Even if bite marks could be "matched," there is no evidence of the probative value of that association.

41.     A 2016 article in the Journal of Law and Biosciences summarized the growing empirical consensus against the reliability of bite mark identifications. It reported, among other things, that ABFO-certified forensic dentists had serious difficulty even identifying whether a suspected bite mark injury was actually a human bite mark.

42.     The Texas Forensic Science Commission and other expert bodies have recommended that courts stop admitting bite mark expert testimony due to its inconsistency, inaccuracy, and the likelihood of producing false convictions.

43.     As described in more detail below, the Innocence Project has taken a prominent role in conducting research into the unreliability of bite mark analysis, its prevalence and misuse in court, and the identification and exoneration of individuals wrongfully convicted as a result of such analysis.

## B.     The American Board of Forensic Odontology

44.     The ABFO currently sets the standards and guidelines for evaluating bite marks. It also serves as the certifying body for forensic odontologists who seek to testify as experts in criminal cases. According to the ABFO website, there are 101 current, certified forensic

odontologists, or "diplomates" as they are known within the organization, who have testified in criminal cases.

45.     Under standards and guidelines set by the ABFO, certified forensic odontologists claimed for decades that they could conclusively say if an investigated bite mark was made by a particular suspect.

46.     As these claims of extraordinary precision came under scientific scrutiny and serious doubt, the ABFO continued to defend the reliability of its methods and its members' testimony. By 2000, DNA evidence had freed several individuals wrongly convicted based on bite mark analysis. The Innocence Project exonerated a person convicted based on bite mark evidence as early as 2003.

47.     Despite these documented failures, the ABFO had never decertified a forensic odontologist, at least as of 2013. The ABFO's membership, as well as its own board, has included forensic odontologists who were known to be involved in cases that produced false convictions and subsequent exonerations.

48.     In 2015, the ABFO conducted a study of ABFO-certified forensic odontologists. That study, too, showed that bite mark analysis is inaccurate and untrustworthy. The study found that when looking at the same injury, the analyses of ABFO-accredited dentists were wildly inconsistent, and these "experts" struggled to agree on even basic questions, such as whether a mark was a bite or not.

49.     The ABFO has often responded to criticism of bite mark analysis by lashing out at critics—even those who are within its own membership—rather than taking their concerns seriously.

50.     For example, as recently as 2015, the ABFO took action against Dr. C. Michael

Bowers, a long-time member of the ABFO turned vocal critic of bite mark analysis. In retaliation

for his outspoken advocacy against bite mark identifications, members of the ABFO tried

unsuccessfully to bar Dr. Bowers from the American Academy of Forensic Sciences, the nation's

preeminent umbrella organization for forensic practitioners.

51.     Other scientific critics of bite mark identification have also been targets of vicious

personal criticism by individuals affiliated with the ABFO. Dr. Mary Bush and Dr. Peter Bush,

both research scientists at the University at Buffalo, conducted significant, highly-regarded

research demonstrating that dentition does not uniquely identify an individual person and that

bite mark identifications are not reliable. They have come under personal ridicule and

professional attack by advocates of bite mark analysis affiliated with the ABFO.

52.     The Innocence Project, in particular, has been treated with hostility by the ABFO.

Some individual ABFO members who recognized the weakness of bite mark evidence have

helped the Innocence Project win exonerations in bite mark cases by, for example, re-examining

evidence and testifying for the wrongfully convicted. But the ABFO as an institution has been

hostile to the Innocence Project's efforts, particularly its research and advocacy to persuade

courts not to allow forensic odontologists to offer expert testimony supporting bite mark

identifications, and its efforts to win exonerations of people convicted on the basis of faulty bite

mark analysis. For example, several prominent ABFO members, including most of its current

leadership, have specifically criticized the Innocence Project, and Mr. Fabricant in particular, for

their work attributing wrongful convictions to faulty bite mark evidence. *See* Thomas J. David &

James M. Lewis, Forensic Odontology: Principles and Practice 184-88 (2018); Robert E. Barsley

et al., *Epidermis and Enamel: Insights Into Gnawing Criticisms of Human Bitemark Evidence*, 39 Am. J. Forensic Med. & Pathology 87, 87-94 (June 2018).

53.     In 2016, the ABFO finally began to step back from its inflated claims about the precision of bite mark identifications and issued revised guidelines to ABFO members. These guidelines are available on the ABFO website. The ABFO no longer claims that its experts can positively identify a unique person corresponding to a bite mark. It now says that bite mark analysts can only "exclude" a person or "fail to exclude" a particular individual—or else determine that a mark is "inconclusive."

54.     Despite reversing its decades-long position with respect to the reliability of bite mark identifications, the ABFO continues to oppose critics and resist efforts to identify and exonerate individuals who were convicted on the basis of guidelines that the ABFO promulgated and defended for years.

**C.     The Innocence Project's Bite Mark Research and Exonerations**

55.     Scholars at the Innocence Project, including its co-founder Peter Neufeld and its Director of Strategic Litigation, M. Chris Fabricant, have produced extensive, published scholarly research on forensic science. *See, e.g.*, M. Chris Fabricant & W. Tucker Carrington, *The Shifted Paradigm: Forensic Sciences' Overdue Evolution from Magic to Law*, 4 Va. J. Crim. L. 1 (2016); Brandon L. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 Va. L. Rev. 1 (2009). This research has been influential in the scientific and academic community to better understand the role of scientific evidence in the fair administration of justice. It has also been widely cited and relied upon by courts, including the Supreme Court of the United States.

56.     The Innocence Project is uniquely well-positioned to conduct research into forensic science and its use in the criminal justice system. Through its work exonerating falsely

convicted individuals, the Innocence Project and its staff are able to identify trends regarding the misapplication of forensic science. Their experience working on behalf of wrongfully convicted individuals—examining in detail the flaws that infected their trials—informs their scholarly research into the use of faulty forensic sciences

57.     The Innocence Project has developed a special interest and expertise in the field of forensic odontology. Mr. Fabricant has authored scholarly articles regarding bite mark evidence and its use in criminal trials. He and his colleague at the Innocence Project, Dana Delger, are among the foremost experts in the country on the misuse of bite mark analysis to procure wrongful convictions.

58.     Their work and that of others has identified at least 30 cases in which bite mark evidence contributed to a wrongful conviction or indictment.

59.     The Innocence Project itself has been directly involved in ten exonerations and consulted on five other cases involving individuals who were falsely convicted due to unreliable bite mark evidence.

60.     This represents a significant and growing portion of the work of the Innocence Project and allied organizations, which has thus far led to the exoneration of 362 people who were wrongfully convicted of crimes they did not commit.

61.     The Innocence Project sought access to the Museum's archives of ABFO historical papers in order to advance this research agenda. As detailed below, the ABFO's papers contain material that would allow the Innocence Project to understand and write about the historical development of bite mark analysis by the ABFO, whether the methods used to develop those guidelines were supported by evidence, and how the ABFO trained and accredited its members to serve as experts.

62.     Access to the archive would also allow the Innocence Project to research and understand other potentially questionable forensic techniques carried out by forensic odontologists under the auspices of the ABFO. These techniques include, for example, dental age estimation. Such techniques may be plagued by similarly inflated claims of false precision as bite mark analysis. These types of errors can have significant human consequences. For example, dental age estimation methods have recently been used at the southern border of the United States to purport to determine with precision whether an asylum seeker who claims to be a minor is in fact 18 years old, in which case she is ineligible for the legal protections afforded to children in the U.S. immigration system.

**D.     The Museum's ABFO Collection and Standard Protocol for Researcher Access**

63.     The Museum is free to enter to members of the general public, who are permitted to visit exhibits on display in the Museum. The Museum's archives may also be visited, by appointment, by researchers who wish to visit exhibits that are not on display or to examine the Museum's collections.

64.     The Museum's archives are extensive and important. For example, its Historical Collections hold about 15,000 artifacts that document the material culture of medicine dating back to 1660. The Museum's Neuroanatomical Collection and Human Development Anatomy Center hold extensive research and educational materials including extensive comparative specimens. These collections are available for research by the public by prior arrangement with the museum.

65.     The Museum's Otis Historical Archives hold institutional records, historical manuscript collections, photographic collections, and rare books. The Otis Historical Archives is open to researchers by appointment.

66.     The Otis Historical Archives house the ABFO collections. The collection is catalogued as "OHA 90.75" and contains ABFO records dating from 1970 through 2009. According to the Museum's description, the records detail the founding, development, and advancement of the ABFO, and the professionalization and standardization of the field of forensic odontology.

67.     In particular, the collection contains six series: (1) administrative material; (2) examination material used by professionals in the field; (3) workshop material; (4) case files and personal material; (5) subject files consisting mostly of reprinted articles and monographs; and (6) audiovisual material including VHS tapes and cassettes of ABFO meetings, lectures, case notes, and presentations.

68.     The Museum's SOP describes the Museum's purpose with regard to the collections it houses. It states, "The objects and specimens comprising the collections of the NMHM are available for research, exhibit, publication, and other educational purposes." It further explains, "This SOP exists to: Preserve the collections for future use, Allow legitimate scientific and historical research of collections materials, and Enhance the scientific and historical value of the collection for public and professionals."

69.     The Museum's SOP also spells out the procedure for researchers to obtain access to collections.

70.     The Museum's SOP requires researchers to speak with collections staff about their specific research before they arrive at the Museum.

71.     Researchers must also submit a formal request for access, which includes the "NMHM Research Request Form," and a written proposal provided by the requestor on his or her institutional letterhead. The researcher's written proposal must describe "the extent and

nature of the research, specimens or collections required, the types of observations or

documentation that will be collected, equipment required, the proposed length of the visit with

proposed dates, and anticipated publication, presentation or dissemination of research products."

72.     The SOP states that research requests are assessed by the Museum based on the

basis of both "scientific/historical merit" and the "ethical treatment of the specimen(s) or

collection."

73.     For off-site requests, services are limited to reprint and photo searches, copies of

reprints, and digital and print copies of images from the collections.

74.     Once approved, a Museum collections staff member locates and transports the

objects in question, and displays one item for viewing at a time. Research is thus supervised by

the collections staff.

75.     The Museum has designated unspecified portions of the ABFO collection to

contain "restricted" material for privacy reasons. The Museum's SOP, however, confirms that

such records may nevertheless be made available to researchers, subject to an assessment of the

"privacy considerations and the ability of the archives to make it available." The SOP

specifically contemplates that researchers may visit such "restricted" archives in person, under

supervision of Museum staff, while specifying that "[r]esearch notes made using restricted

collections may be subject to review."

76.     The Museum's detailed description of the ABFO collection affirms that "[t]he

Otis Historical Archive is committed to providing open access to its records as far as possible

within the limits of privacy and confidentiality," even while access "is at the discretion of the

Otis Historical Archive and material contained within the records may be subject to review

before access is granted."

77.     As the subject of the collections, the ABFO has unrestricted access to the ABFO archives. However, nothing in the Museum's SOP or any other document states that the ABFO has any say in deciding whether third parties get access. To the contrary, a document entitled "ABFO Archive Collection Access Protocol" that is hosted on the ABFO's website makes it clear that the Museum makes the collection available to "other researchers in accordance with [the Museum's] access policies." The same document specifically contemplates that researchers "unaffiliated" with the ABFO may submit access requests and that "[t]he [Museum] will consider requests" and decide whether to grant access.

78.     As detailed presently, the Museum has previously granted access to information from the ABFO collection to third-parties at least once, including information referencing specific, personally-identified cases. In that instance, however the researchers in question were not understood to be critics of bite mark analysis or the ABFO—unlike the Innocence Project.

**E.     The Museum's Previous Grant of Access to Another Organization That Sought Information about Bite Mark Cases**

79.     Under its existing SOP, the Museum granted access to the ABFO archive to another third-party organization, the Texas Forensic Science Commission ("TFSC").

80.     The TFSC was created in 2005 by the Texas Legislature.

81.     The TFSC is required to investigate "allegations of professional negligence or professional misconduct that would substantially affect the integrity of the results of a forensic analysis conducted by an accredited laboratory."

82.     In 2015, the Texas Legislature expanded the role of the TFSC. As a result of this expansion, the TFSC oversees "the accreditation process for crime laboratories and other entities conducting forensic analyses for use in criminal proceedings." As part of this expanded role, the TFSC is "responsible for establishing procedures, policies, and practices to improve the quality

of forensic analyses conducted in Texas." The TFSC also has a statutory mandate to investigate

and report on the "integrity and reliability" of forensic methodologies that are not accredited.

83.     In January 2016, the TFSC made a request to access the ABFO bite mark records

housed at the Museum. Much like the Innocence Project, the TFSC requested access to portions

of the Museum's ABFO records that would identify cases in which forensic odontologists had

provided expert testimony.

84.     At the time of the TFSC's request, the TFSC was conducting an investigation into

the reliability of forensic bite mark evidence during which it received information and opinions

from both proponents and opponents of bite mark analysis. When the Museum agreed to grant

the request, the TFSC had yet to come out against the use of bite mark analysis in court settings,

nor had it released any negative reports on bite mark analysis or forensic odontology.

85.     The TFSC talked to and exchanged emails with one of the Museum's archivists,

Defendant Laura Cutter, in order to arrange for access to information from the ABFO collection.

86.     Specifically, the TFSC emailed the Museum in the hopes of scheduling an

appointment for its General Counsel, Lynn Garcia, to conduct research with the purpose of

investigating the practice of forensic odontology. The TFSC expressed a desire to identify any

and all Texas cases in which a forensic odontologist had testified and specifically requested

access to OHA 90.75 ABFO records, series 004: Case Files, Boxes 024-035.

87.     Defendant Cutter responded to the TFSC's request, indicating that these records

contained material that could implicate the privacy of victims, suspects, and third parties. Ms.

Cutter further stated that access could potentially be achieved through at least two means. First, a

museum archivist could "go through each case record to find [relevant information]," reviewing

each case "for any privacy concerns that it might present." Second, "[i]f you are considering a

wider survey of case files, to better understand how forensic odontology operates in practice, that would require a different approach. Perhaps a working agreement of some kind."

88.     In that same reply email, Ms. Cutter specifically asked the TFSC if it was working with the Innocence Project on the cases it had requested, and if the TFSC was directly affiliated with the Innocence Project. TFSC's response is not recorded in the email correspondence, but may have been provided in a subsequent telephone conversation.

89.     Ms. Cutter and the Museum exchanged subsequent communications during which Ms. Cutter asked the TFSC to file a formal request for the records, which the TFSC did.

90.     Ms. Cutter and the Museum subsequently granted the TFSC's request. The Museum and TFSC evidently opted for the first approach that Ms. Cutter had outlined: Ms. Cutter reviewed the case files in the ABFO archive, identified those of interest to the TFSC, and compiled a list of all relevant cases she could identify for the TFSC. The list disclosed the names and dates of cases and sometimes also case file numbers.

**F.      The Museum's Refusal to Allow the Innocence Project to Conduct Research at the Archives**

91.     On or about June 30, 2017, the Innocence Project, through Chris Fabricant, requested access to the ABFO records housed at the Museum. The Innocence Project wanted to examine these records for up to two days about a month later, beginning on July 26, 2017.

92.     Specifically, the Innocence Project requested access to the Museum's ABFO Collection, OHA 90.75.

93.     Mr. Fabricant wrote a three-page written proposal that he attached to the NMHM Research Request Form formally requesting access. The written proposal specified the requested access, explained the scholarly work of the Innocence Project, and detailed its reasons for requesting the bite mark records.

94.     In particular, the Innocence Project's proposal expressed a desire to view all six series in the ABFO collections, with particular emphasis on series 003, 004, and 005. The proposal indicated that the Innocence Project was seeking records "relating to the methodologies associated with taking dental molds, photographic techniques for documenting bite marks and other patterned injures, and the comparison and reporting process." The proposal further explained that the Innocence Project sought records relating to the evolution of the ABFO's standards for defining and identifying bite marks, as well as testimonial conclusions approved by the ABFO for use in case work and the conclusions offered in specific trials.

95.     The proposal explained in detail the research objectives of the Innocence Project and its reasons for requesting access. It explained that the Innocence Project holds a deep interest and expertise in the intersection of science and the law, and that this interest results in their work in exonerating individuals through post-conviction DNA testing, as well as scholarship on issues relating to the legal applications of scientific developments.

96.     The proposal further explained that the Innocence Project was in pursuit of a more comprehensive understanding of forensic odontological methods and the evolution of the discipline. It explained that the archive held in the Museum is a potentially invaluable resource for forensic science researchers, because the ABFO is the only board-certifying entity in forensic dentistry and the Museum's holdings are the only known repository of the organization's records.

97.     The proposal further explained that the Innocence Project required access because many of the documents housed in the Museum's ABFO collection may be the only surviving copies of public records relating to bite mark analysis in particular cases.

21

98.     The proposal estimated that the Innocence Project's research proposal would require only one to two days in the archive and that no special equipment would be required to accommodate the research.

99.     Mr. Fabricant subsequently spoke to and exchanged emails with Ms. Cutter, the same Museum archivist who had facilitated the TFSC access to the bite mark analysis records the previous year. Preliminary conversations between Mr. Fabricant and Ms. Cutter were positive and encouraging, leading the Innocence Project to believe that access would be granted in some form.

100.    Ms. Cutter stated in an email to Mr. Fabricant that "I am optimistic that we will be able to accommodate your visit and make the majority of the materials you've requested available to you."

101.    In the same email, she indicated that she would need to have additional conversations with the ABFO before access was granted.

102.    The ABFO has been hostile to the Innocence Project's efforts to expose flaws in bite mark analysis and to identify and exonerate individuals falsely convicted as a result of expert bite mark testimony.

103.    Upon information and belief, Ms. Cutter spoke to members of the ABFO after this exchange and the ABFO members objected to granting the Innocence Project access to the ABFO collection held by the Museum.

104.    The Museum subsequently changed its posture regarding the Innocence Project's request. After sending the above-referenced email and, presumably, speaking with the ABFO, the Museum no longer engaged with the Innocence Project in a cooperative way regarding its request for access.

105. Ultimately, the Museum issued a letter denying nearly all of the Innocence Project's request for access. Specifically, it denied access to all materials relating to the ABFO administration (series 001); ABFO examinations, handbooks, syllabi and other material relating to the training and certification of ABFO members (series 002 and 003); all files regarding particular cases in which bite mark testimony was used (series 004); and all video and audio recordings of ABFO meetings, external lectures, case notes and presentations (series 006). The Museum only granted the Innocence Project limited access to one series, 005, consisting primarily of articles, monographs, and reference files.

106. The denial itself suggested that the Museum's decision to deny access was based on disagreement with the research objectives and likely findings of the Innocence Project.

107. Specifically, the denial letter stated that the Museum, in considering access to the request must consider the privacy concerns involved in providing access "against the stated objective of the [Innocence Project]. That is, to learn more about the field of forensic odontology and potentially use that information to overturn wrongful convictions." The letter immediately contrasted this characterization of the Innocence Project's objectives with an assertion regarding the research objectives that the museum favors: "The NMHM supports research that advances the understanding of forensics – both its great potential as well as its limitations."

108. The letter failed to explain how the Innocence Project's research objective, as stated in its proposal or as characterized by the Museum in the denial letter, fell outside the scope of research that "[t]he NMHM supports." It also mischaracterized the Innocence Project's detailed and specific research proposal, suggesting, falsely, that it did not "detail[] the relevancy of the information requested and its context."

109.    The Museum, acting on its own behalf or that of the ABFO, denied access to the Innocence Project because it disagreed with the Innocence Project's viewpoint, the findings that it was likely to reach critical of bite mark analysis, and the uses to which it intended to put information in the archives, including its intention to "use . . . information to overturn wrongful convictions."

## G.    The Innocence Project's Subsequent FOIA Request

110.    After the Museum denied the Innocence Project's request to visit the archives or otherwise to conduct research in the archives pursuant to the Museum's SOP, the Innocence Project filed a FOIA request. The Innocence Project pursued the FOIA request as an alternative means of access even though disclosure through FOIA would be more cumbersome, inefficient, and burdensome for the Museum than simply obtaining ordinary researcher access to visit the physical archive for a day or two under the supervision of Museum staff. The Museum's refusal to permit the Innocence Project to visit the archive, however, left the Innocence Project with no other option.

111.    Accordingly, on February 26, 2018, the Innocence Project submitted a FOIA request for "[t]he National Museum of Health and Medicine's archives of the American Board of Forensic Odontology ("ABFO") records (OHA 90.75)."

112.    The FOIA request also sought information regarding the reasons that the Museum denied the Innocence Project's request for access, specifically, "electronic communications between the National Museum of Health and Medicine and the ABFO regarding the Innocence Project's request for documents sent on June 30, 2017, including, but not limited to, communications between Laura Cutter and David Shackelford." (Attached hereto as Exhibit A is a copy of the FOIA request.)

113.    The FOIA request further sought a limitation of FOIA search, review, and processing fees.

114.    The FOIA request was prepared and handled by Julia Baker, an attorney representing the Innocence Project.

115.    The FOIA request was referred to DHA for processing because DHA has responsibility for processing FOIA requests relating to the Museum.

116.    On April 20, 2018, in response to a query from the Innocence Project's counsel, DHA emailed to confirm receipt of the FOIA request. DHA did not provide a timeframe for responding to the request.  (Attached hereto as Exhibit B is a copy of the response.)

117.    On June 26, 2018, DHA responded to an email from the Innocence Project's counsel requesting a status update with the following: "Although we are in receipt of some records, we are currently responding to previously received requests for which we also have records. We anticipate providing an interim response to your request #2018-186 by July 3, 2018."  (Attached hereto as Exhibit C is a copy of the response.)

118.    DHA did not provide any records or other response by July 3, 2018. The Innocence Project or its counsel received no subsequent correspondence from DHA until February 2019.

119.    On February 13, 2019, the Innocence Project, through counsel, filed a letter supplementing the initial request for a limitation of fees with additional facts and seeking a public interest fee waiver. (Attached hereto as Exhibit D is a copy of the letter.)

120.    In response, on February 14, 2019, the Innocence Project's counsel received an email from DHA stating that DHA had issued an "interim response" to the request dated July 27, 2018. The "interim response" letter, which was attached to DHA's February 14, 2019, email,

purported to require the Innocence Project to reduce the scope of its request, stating that the

request would "not be considered perfected" otherwise. The interim respose letter also indicated

that it attached "documents partially responsive to your request." Those records were not

attached to DHA's email. (Attached hereto as Exhibit E is a copy of DHA's February 14, 2019,

email and the attached letter dated July 27, 2018.)

121.   DHA's February 14, 2019, email further stated that DHA had "administratively

closed" the request because it had not received a response to its purported July 27, 2018, letter.

122.   The Innocence Project and its counsel had never received the July 27, 2018,

"interim response" letter nor has it ever received any of the documents that were purportedly

enclosed with that response.

123.   On February 18, 2019, the Innocence Project sent a letter to DHA via email,

explaining that DHA's decision to "administratively close" the request was improper for several

reasons and asking DHA to continue to process the request as usual. The letter also responded to

DHA's purported demand that the Innocence Project reduce the scope of the request, explaining

both that under FOIL and applicable regulations DHA could not delay its obligation to timely

respond to the request in this manner and, in addition, that the Innocence Project stands ready to

negotiate a reasonable narrowing of the request if DHA can provide sufficient information about

the content of the archive to allow the Innocence Project to determine whether certain portions

are not of interest to it or to the public. (Attached hereto as Exhibit F is the Innocence Project's

February 18, 2019, letter.)

124.   DHA still has provided no records to Innocence Project. DHA also has not

provided any response explaining why the bulk of the requested materials fall within a FOIA

exemption or otherwise may lawfully be withheld.

125.    Nearly a year has passed since the Innocence Project filed its FOIA request. The Innocence project has not received a complete response within the statutory timeframe. DHA has not made any determinations with respect to the request that are subject to administrative appeal. Accordingly, the Innocence Project has exhausted its administrative remedies and may seek relief in this Court. 5 U.S.C. § 552(a)(6)(C)(i).

126.    The Defendants' refusal to provide any meaningful access to the ABFO collections under either the Museum SOP or FOIA is impairing the Innocence Project's ability to engage in critically important scholarly research and First-Amendment protected advocacy. Without access to the archives, the Innocence Project cannot engage in research regarding the historical development of forensic odontology, the details of the methods employed by ABFO-accredited experts over time, and cases in which individuals may have been wrongfully convicted on the basis of faulty bite mark testimony. Defendants have also prevented the Innocence Project from potentially identifying people wrongfully convicted and advocating for their exoneration.

127.    Left with no other recourse to pursue access to these records, the Innocence Project brings this action in order to compel the Museum to allow the Innocence Project to conduct research in the archives in accordance with its SOP, or else to produce documents promptly as required by FOIA.

**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
**Violation of the First Amendment to the U.S. Constitution**
**(Unlawful viewpoint discrimination – as to the individually-named defendants)**

128.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

129.    Courts have long recognized that the First Amendment prevents discrimination on the basis of viewpoint. A government actor cannot treat someone differently because of the views they hold, or because of what they intend to say or communicate. The government also engages in viewpoint discrimination when it favors the views of one group over the opposing views of another group.

130.    In a designated public forum or a limited public forum, the government cannot engage in viewpoint discrimination. Viewpoint discrimination is prohibited even in a non-public forum.

131.    The Museum is a designated or limited public forum open to members of the public and subject only to content-neutral rules and regulations. Even if the Museum is regarded as a non-public forum, the First Amendment prohibits viewpoint discrimination in that context too.

132.    The First Amendment also prohibits the government from depriving individuals of government benefits or programs on account of their viewpoint. By refusing to allow the Innocence Project access to the ABFO collection of the Museum archive, Defendants deprived the Innocence Project of such benefits.

133.    Defendants engaged in illegal viewpoint discrimination when they denied the Innocence Project's request for access. The denial was based on disagreement with or hostility to the Innocence Project's viewpoint, the likely outcomes of its proposed research, and/or the First-Amendment protected speech and advocacy that the Innocence Project intended to undertake using the information in the archive. The denial favored the viewpoint of one private organization, the ABFO, over that of another, the Innocence Project.

### SECOND CLAIM FOR RELIEF
### Retaliation in Violation of the First Amendment
### (Unlawful retaliation for protected speech – as to the individually-named defendants)

134.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

135.    In order to prove a claim of First Amendment retaliation, a plaintiff must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) the defendant's actions caused him some injury. *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015).

136.    Plaintiff has engaged in speech and conduct protected by the First Amendment including but not limited to (1) criticizing bite mark evidence as unsound and unreliable in numerous publications and media, (2) bringing cases and demonstrating in courts across the country that bite mark evidence has led to many wrongful arrests and convictions and should be excluded as inadmissible evidence, (3) helping to exonerate numerous wrongfully convicted people due to flawed bite mark evidence, and (4) engaging in a variety of research, speech, and advocacy that challenges the ABFO, the work of its members, and the validity of the forensic bite mark methods that the ABFO has developed and promoted over decades. Plaintiff's speech and conduct against flawed bite mark evidence are matters of public concern that are entitled to protection under the First Amendment. In addition, seeking to exonerate wrongfully-convicted people through post-conviction litigation is activity protected by the First Amendment, because it is an exercise of both the freedom of speech and the right to petition government for redress of grievances.

137.    The Museum has taken adverse actions against the Plaintiff by denying its formal request to conduct research in the Museum's ABFO collection. The Museum reversed its

positive posture with respect to the Innocence Project's request after it conferred with the ABFO, an organization that is hostile to the Innocence Project's protected speech and advocacy.

138.     The Museum denied Plaintiff's access to visit the archives for improper motive and intent, and caused Plaintiff to suffer concrete harm. The ABFO records preserved in the Museum are invaluable resources for the Innocence Project's researchers. Many of the records in the archive are unavailable anywhere else. The denial of access has not only prevented the Innocence Project from conducting important research on bite mark analysis, but also impeded its efforts to exonerate people wrongfully convicted due to flawed bite mark evidence.

### THIRD CLAIM FOR RELIEF
### Violation of Administrative Procedure Act
### (Denial of access was arbitrary, capricious, and contrary to law – as to all defendants)

139.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

140.     The APA provides for judicial review of agency actions causing legal harm or adverse effects to a plaintiff. 5 U.S.C. § 702.

141.     If a Court finds agency actions, findings, or conclusions "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" the Court must deem these actions unlawful. 5 U.S.C. 702(2)(A).

142.     Defendants have taken final agency action by denying the Innocence Project's request to conduct research in the collection of ABFO records held by the Museum.

143.     This collection is accessible to any researcher that makes an application to view them for research purposes and is then approved by the Museum.

144.     Plaintiff applied for such access and was denied access to most of the collection.

145.     This agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA because it is inconsistent with the

Museum's decision to allow the TFSC access to the records for the substantially similar purposes. Defendants' action is arbitrary and capricious because the Museum undermined its own decision making process by coming to directly opposing positions on two issues that are substantially similar.

146.    The agency action is arbitrary, capricious, and an abuse of discretion for the further reason that its decision mischaracterized and misrepresented the substance of the Innocence Project's research proposal submitted in support of its formal request for access to the archive.

147.    In addition, under 5 U.S.C. § 706(2)(B), agency action that is "contrary to constitutional right, power, privilege, or immunity" can be held unlawful and set aside by the court.

148.    The agency action here violated the First Amendment by engaging in unlawful viewpoint discrimination and retaliation for protected speech. It should be held unlawful and set aside on that basis too.

149.    Defendants' actions have had adverse effects on the Plaintiff by stunting its efforts as an organization to conduct scholarly research on forensic odontology, to further understand the flaws in how bite mark analysis has been conducted over decades, to identify individuals who have been wrongfully convicted due to false identifications based on bite mark analysis, and to advocate for exonerations on behalf of those individuals.

150.    Plaintiff is therefore entitled to judicial review under the APA because it has suffered legal wrongs, been adversely affected, and remains aggrieved by Defendants' final actions. Plaintiff has no other adequate remedy for these violations.

**FOURTH CLAIM FOR RELIEF**
**Violation of FOIA**
**(Failure to timely respond to FOIA request – as to DoD, DHA, and the Museum)**

151.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

152.    DoD and DHA failed to respond to the FOIA Request within the statutorily mandated timeframe, which is in violation of Plaintiff's rights under FOIA, including but not limited to 5 U.S.C. §§ 552(a)(6)(A)(i) and (6)(B).

153.    DoD and DHA failed to provide contact information for their FOIA public liaisons or make them available to Plaintiff, in violation of Plaintiff's rights under FOIA, including but not limited to 5 U.S.C. § 552(a)(6)(B)(ii).

154.    DoD and DHA failed to make reasonable efforts to search for records responsive to the FOIA request, in violation of Plaintiff's rights under FOIA, including but not limited to 5 U.S.C. § 552(a)(3).

155.    DoD and DHA failed to disclose and produce all records responsive to the FOIA request, in violation of Plaintiff's rights to those records under FOIA, including but not limited to 5 U.S.C. § 552(a)(3)(A).

156.    DoD and DHA failed to disclose and produce records responsive to the FOIA request without a legal basis for withholding such records, in violation of FOIA, including but not limited to 5 U.S.C. §§ 552(a)(3)(A) and (6)(A).

157.    DoD and DHA failed to grant Plaintiff a limitation of fees or a public interest fee waiver, in violation of FOIA, 5 U.S.C. §§ 552(a)(4)(A)(ii), (iii), and (viii).

158.    Plaintiff is entitled to its reasonable attorney's fees and costs under 5 U.S.C. § 552(a)(4)(E).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     Declare that the decision by Defendants to deny Plaintiff's request for access to the Museum archive violated the First Amendment.

(2)     Declare that the decision by Defendants to deny Plaintiff's request for access to the Museum archives violated the APA because it was arbitrary, capricious, an abuse of discretion, and contrary to law.

(3)     Hold unlawful, set aside, or otherwise invalidate Defendants' decision to deny the Plaintiff's request for access to the ABFO records housed in the Museum archives.

(4)     Order  Defendants  to permit Plaintiff access to the  ABFO records  housed  in  the Museum archive.

(5)     Order DoD, DHA, and the Museum immediately to respond to Plaintiff's FOIA request by searching for and disclosing the requested records in their entireties.

(6)     Declare whether any FOIA exemptions claimed prior to or in the course of this litigation are proper, and order disclosure of all non-exempt records and non-exempt portions of records;

(7)     Declare that Plaintiff is entitled a limitation of fees and a public interest fee waiver under FOIA.

(8)     Enjoin DoD, DHA, and the Museum from charging search, review, or duplication fees under FOIA.

(9)     Order DoD, DHA, and the Museum to provide for expeditious proceedings.

(10)    Award Plaintiff its costs and attorney's fees pursuant to 5 U.S.C. § 552(a)(4)(E) and 28 U.S.C. § 2412.

(11)    Grant any other relief as this Court may deem just and proper.

Dated: February 20, 2019
Buffalo, New York

Respectfully submitted,

/s/Jonathan Manes
Samantha Winter, *Law Student Intern*
John Zakour, *Law Student Intern*
John Kuebler, *Law Student Intern*
Jonathan Manes (JM-3238)
UNIVERSITY AT BUFFALO SCHOOL
    OF LAW
507 O'Brian Hall, North Campus
Buffalo, NY 14260-1100
Tel: (716) 645-6222
Fax: (716) 645-6199
jmmanes@buffalo.edu

M. Chris Fabricant (MF-9403)
Dana Delger
INNOCENCE PROJECT, INC.
40 Worth Street, Suite 701
New York, NY 10013
Tel: (212) 364-5340
cfabricant@innocenceproject.org
ddelger@innocenceproject.org